# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

UNITED STATES OF AMERICA    )
    )
    )
    )
    )
vs.    )    Case No: **3:22-CR-024**
    )    **JUDGE CRYTZER**
    )
    )
    )
VICTOR BTESH,    )
MICHELLE'S DVD FUNHOUSE, INC.,    )
MJR PRIME, LLC,    )
PRIME BROOKLYN, LLC    )
    )
    Defendants    )

---

## MOTION FOR DOWNWARD VARIANCE
## AND SENTENCING MEMORANDUM ON BEHALF OF
## VICTOR BTESH,
## MICHELLE'S DVD FUNHOUSE, INC.,
## MJR PRIME, LLC, and
## PRIME BROOKLYN, LLC

---

**THE BOSCH LAW FIRM, P.C.**

**Donald A. Bosch (BPR # 013168)**
**Ann C. Short (BPR # 009645)**
**712 S. Gay Street**
**Knoxville, Tennessee 37902**
**865.637.2142**

**Counsel for Defendants**

## INTRODUCTION

COME NOW the defendants, Victor Btesh, Michelle's DVD Funhouse, Inc., MJR Prime, LLC, and Prime Brooklyn, LLC, by and through counsel, pursuant to Rules 32 and 35 of the Federal Rules of Criminal Procedure; 18 U.S.C. § 3553(a), (e), (f); 28 U.S.C. § 944(j); *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586 (2007), *Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558 (2007), *Spears v. United States*, 555 U.S. 261, 129 S. Ct. 840 (2009), and other authorities set forth herein, and respectfully submit this Sentencing Memorandum to the Court setting forth the reasons for a downward variance from the sentences recommended by the advisory sentencing guideline range, as calculated by the Presentence Investigator, and from the method of service of the sentence as it relates to Mr. Btesh.

As shall be explained in greater detail, Mr. Btesh requests this Court to impose a sentence in Zone A to be served on probation for a term of 60 months, 18 U.S.C. § 3561(c)(1), with standard and special conditions of probation as the Court deems appropriate, including community service and compliance with the programs and monitoring recommended by The Aleph Institute, as more fully set out herein. See USSG § 5B1.2. Such a sentence is sufficient but not greater than necessary to comply with the purposes set out in 18 U.S.C. § 3553(a)(2).

In the alternative, Mr. Btesh requests that the Court impose a probationary sentence along with home detention not to exceed 12 months to allow him to engage in spiritual counseling and other monitoring as recommended by The Aleph Institute and by thus Court,

2

Finally, if the Court is considering an incarcerative sentence, Mr. Btesh requests that the Court impose a term of incarceration of 12 months and 1 day, followed by 1 year of supervised release. In the event an incarcerative sentence is imposed, Mr. Btesh asks the Court to make a recommendation to the Bureau of Prisons in the Judgment that he be designated for placement at Federal Prison camp Otisville in Otisville, New York.

Mr. Btesh requests that after considering all relevant circumstances, the Court impose a personal monetary fine of two percent of the agreed $1.9 million volume of commerce.

Further, Mr. Btesh requests that the monetary fines imposed for Michelle's DVD Funhouse, Inc., MJR Prime, LLC, and Prime Brooklyn, LLC be reduced from the advisory sentencing guideline amount, pursuant to USSG § 8C3.4

Mr. Btesh and Michelle's DVD Funhouse, Inc., MJR Prime, LLC, and Prime Brooklyn, LLC will have paid their combined $1,300 special assessment before sentencing.

The supporting grounds for the downward variance as to Mr. Btesh include:

- A variance is appropriate and fair to produce a non-incarceratory sentence so as to bring Mr. Btesh's conduct in line with the comparable conduct and punishment of similarly-situated defendants;

- Mr. Btesh's cooperation with law enforcement authorities merits a downward departure or variance;

- Mr. Btesh meets the criteria for a probationary sentence as proposed by the Practitioners Advisory Group of the U.S. Sentencing Commission, which has repeatedly recommended to the Commission that Chapter 5 of the

3

Guidelines be amended to provide a means for nonviolent, first offenders specifically to be sentenced to a term of probation, without regard for the guideline range that would otherwise be applicable;

- Mr. Btesh is truly a "first offender," deserving of lesser punishment; and

- Mr. Btesh has already suffered greatly as a result of his conduct.

# I.  18 U.S.C. § 3553(a) SENTENCING FACTORS

Section 3553(a) lists seven factors that a sentencing court must consider.  The first factor is a broad command to consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  The second factor requires the consideration of the general purposes of sentencing, including the need for the sentence imposed—"(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "(B) to afford adequate deterrence to criminal conduct"; "(C) to protect the public from further crimes of the defendant"; and "(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  *Id.* § 3553(a)(2).  The third factor pertains to "the kinds of sentences available," *id.* § 3553(a)(3); the fourth, to the Sentencing Guidelines, *id.* § 3553(a)(4); the fifth, to any relevant policy statement issued by the Sentencing Commission, *id.* § 3553(a)(5); the sixth, to "the need to avoid unwarranted sentence disparities," *id.* § 3553(a)(6); and the seventh, to "the need to provide restitution to any victim," *id.* § 3553(a)(7).  Preceding this list is the **overriding directive** to "impose a sentence sufficient, but not greater than necessary," to achieve the sentencing purposes.

5

## II. FACTUAL AND PROCEDURAL BACKGROUND

At some point, likely in 2019, Victor Btesh became the target of an investigation being conducted by the Department of Justice [DOJ] Antitrust Division. That investigation focused on the sale and distribution of DVDs and Blu-Ray Discs through the Amazon Marketplace platform to customers located throughout the United States, which the government believed involved a criminal conspiracy in restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

One DVD/Blu-Ray seller on the Amazon Marketplace platform was David Camp who resided in Sweetwater, Tennessee within the Eastern District of Tennessee. He was interviewed by DOJ Antitrust Division trial counsel on October 29, 2019. He agreed to be charged by Information on June 24, 2021, and he entered a guilty plea, on July 23, 2021, to one count of conspiracy to violate the Sherman Act. *United States v. David Camp*, No. 3:21-CR-83 (E.D. Tenn.). [ECF 1, 2, 12]. The timeframe for the charged conspiracy was "[b]eginning in at least as early as May 2018 and continuing until on or about October 29, 2019." [ECF 1].

Victor Btesh and co-defendant, Bruce Fish, were interviewed by DOJ Antitrust Division trial counsel on October 29, 2019. Mr. Fish was interviewed a second time on September 16, 2021. On March 16, 2022, over two years after Mr. Btesh's interview, the Grand Jury for the Eastern District of Tennessee returned a one-count Indictment, charging conspiracy to violate Section 1 of the Sherman Act, 15 U.S.C. § 1, naming Mr. Btesh and three business entities in which he is the principal owner: Michelle's DVD Funhouse, Inc., MJR Prime, LLC, and Prime Brooklyn, LLC. Also named and charged in the Indictment was

6

Bruce Fish and a business entity in which he is the principal owner: BDF Enterprises, Inc. *United States v. Victor Btesh, et al.*, No. 3:22-CR-24 (E.D. Tenn.). [ECF 1]. Mr. Btesh is a resident of Brooklyn, New York; Bruce Fish resides in Hayfield, Minnesota. The timeframe for the charged conspiracy was "[b]eginning in at least October 2016 and continuing until on or about October 29, 2019." [ECF 1].

On January 27, 2021, prior to the return of the Indictment naming Mr. Btesh, Morris Sutton was interviewed by DOJ Antitrust Division trial counsel. He agreed to be charged by Information on November 2, 2021, and he entered a guilty plea on January 6, 2022, to one count of conspiracy to violate the Sherman Act. *United States v. Morris Sutton*, No. 3:21-CR-138 (E.D. Tenn.). [ECF 1, 2, 4, 22]. Mr. Sutton operated an Amazon Marketplace storefront with a business address located in Deal, New Jersey. [ECF 1]. The timeframe for the charged conspiracy was "[b]eginning in at least November 2017 and continuing until on or about October 29, 2019." [ECF 1].

On February 18, 2021, prior to the return of the Indictment naming Mr. Btesh but after the interview of Morris Sutton, Emmanuel Hourizadeh was interviewed by DOJ Antitrust Division trial counsel. Five days later on February 23, 2021, Raymond Nouvahian was interviewed by DOJ Antitrust Division trial counsel. Mr. Hourizadeh and Mr. Nouvahian agreed to be jointly charged by Information on November 4, 2021, and they entered guilty pleas on January 6, 2022, to one count of conspiracy to violate the Sherman Act. *United States v. Emmanuel Hourizadeh, et al.*, No. 3:21-CR-143 (E.D. Tenn.). [ECF 1, 2, 4, 6, 35, 37]. Mr. Hourizadeh and Mr. Nouvahian jointly operated a number of virtual storefronts on the Amazon Marketplace platform with business addresses located, inter alia, in Valley

Stream, New York; Brentwood, New York; Panama City Beach, Florida; and Terre Haute, Indiana. [ECF 1]. The timeframe for the charged conspiracy was "[b]eginning in at least November 2017 and continuing until on or about October 29, 2019." [ECF 1].

An initial appearance and arraignment by video for Mr. Btesh were held on May 10, 2022. Retained Knoxville counsel appeared on behalf of Mr. Btesh and his business entities. [ECF 25]. The government did not move for pretrial detention, and Mr. Btesh has remained on pretrial release and supervision.

Original Knoxville counsel were permitted to withdraw by Order entered August 17, 2022. [ECF 61]. Present counsel for Mr. Btesh filed a Notice of Appearance on August 15, 2022. [ECF 60]. On January 5, 2023, Mr. Btesh and his three business entities entered into plea agreements with the government. [ECF 68-75]. Mr. Fish reached a plea agreement with the government on January 11, 2023. [ECF 76-79]. A change of plea hearing for Mr. Btesh and his businesses was conducted February 9, 2023. [ECF 82-85]. Mr. Btesh appeared in person for the change of pleas.

Mr. Btesh and his businesses are scheduled to be sentenced on July 20, 2023. [ECF 82-85].

### III. AMAZON'S PLACE IN THE GLOBAL ECONOMIC COMMUNITY

Inasmuch as sales on Amazon Marketplace are at the heart of this case, it is altogether appropriate to pause long enough to take stock, in an abbreviated fashion, of the history of Amazon. Historical context can be informative, as this case illustrates.

Jeff Bezos founded Amazon in 1994; it began as a simple online bookstore. Since that time, Amazon has grown into the world's largest online eCommerce store. Amazon has extended its product and service offerings and has entered, inter alia, the streaming video industry, the cloud computing marketplace, and even the banking industry.

Amazon is primarily a customer-friendly eCommerce platform that allows customers to purchase a vast range of products. Amazon Marketplace, by contrast, is primarily a seller-friendly platform that allows anyone to sell directly to online customers. Amazon Marketplace is a third-party retail market that is incorporated into the same platform as Amazon. For that reason, many buyers are unaware that they are purchasing from third-party merchants.

What follows draws heavily on the 2017 Article by Lina M. Khan, published in the Yale Law Journal, entitled <u>Amazon's Antitrust Paradox</u>, 126 Yale L.J. 710 (2016). Ms. Khan was sworn in as Chair of the Federal Trade Commission on June 15, 2021. Prior to that time, she was an Associate Professor of Law at Columbia Law School. She also previously served as counsel to the U.S. House Judiciary Committee's Subcommittee on Antitrust, Commercial, and Administrative Law. Ms. Khan is a recognized expert in the Antitrust field. In her current position, her focus is less on consumer protection/welfare and more on the concentration of power wielded by corporate monopolies and Big Tech. Her

9

2016 Yale Law Journal Article succinctly captures and explains the rise of Amazon to its position as "the" Titan of 21st century commerce.

Amazon's dominance rests on two elements of its business strategy: (1) "a willingness to sustain losses and invest aggressively at the expense of profits"; and (2) "integration across multiple business lines." 126 Yale L.J. at 746-47. For much of Amazon's existence, losses, not profits, were the norm. Despite the losses, Amazon's share price rose. The goal of Amazon's business model, as outlined in the beginning by Bezos, was to establish scale by prioritizing growth through aggressive investing, even if that "involved slashing prices or spending billions on expanding capacity, in order to become consumers' one-stop-shop." 126 Yale L.J. at 749.

The development of Amazon Prime, which began offering subscribers unlimited two-day shipping at a fixed yearly cost, has been described as Amazon's "single biggest driver of growth," although Amazon has lost billions with the venture. 126 Yale L.J. at 750. Amazon Prime changed the individual's mindset so that users became more likely to buy on its platform and less likely to shop elsewhere.

Another key strategy deployed by Amazon was to expand aggressively into multiple business lines by acquiring existing firms. Amazon is not just a retailer. It is "a marketing platform, a delivery and logistics network, a payment service, a credit lender, an auction house, a major book publisher, a producer of television and films, a fashion designer, a hardware manufacturer, and a leading provider of cloud server space and computing power." 126 Yale L.J. at 754. As a result, in many instances Amazon's rivals are also its customers.

10

The clearest example of how the company leverages its power across online businesses is Amazon Marketplace, where third-party retailers sell their wares. These sellers list their goods on Amazon's platform, and Amazon collects "referral" fees based on a percentage of sales from the sellers and other "fulfillment" fees depending whether a third-party retailer is part of the FBA "Fulfilled by Amazon" program, whereby Amazon charges a warehouse fee for the product and handles all shipping and return stages. *See* 126 Yale L.J. at 780-83. The revenue that Amazon generates through Marketplace has been a major source of its growth.[1] Third-party sellers using Marketplace recognize that using the platform puts them in a bind as Amazon is also their primary competitor. Amazon has in the past, moreover, conditioned showing third-party offers as "featured" on the third party fixing its price at lower levels, with no evident consideration of margins. (Attachment 1) (Amazon email to Prime Brooklyn).

As part of discovery in Mr. Btesh's case, the government provided what purports to be a summary of information provided by Amazon's counsel to Antitrust Division Counsel in this case. (Attachment 2; permission to file under seal pending). Information provided states that Amazon "generally" allows only one account per person or entity. Then, however, Amazon counsel describes a rather lax system of accountability whereby once a person or entity is the registered account owner, a seller "can change most elements of its seller account information, including changing the storefront name and the name on the account." (Attachment 2). Indeed, "a seller may permit others to operate the account on

---

[1] Amazon's average cut of each sale on its marketplace has increased in recent years, surpassing 50% in 2022, according to a study by Marketplace Pulse, up from 35% in 2016. *See* Bloomberg, *Lina Khan is Coming for Amazon, Armed With an FTC Antitrust Suit* (June 29, 2023) (Attachment 3).

behalf of the seller." Those others "could, for example, list, ship, and package products." (Attachment 2). According to Amazon counsel, Amazon often does not collect IP address information. Amazon, consequently, "cannot necessarily determine whether the account holder is the person who logged in." (Attachment 2).

Also, according to Amazon counsel, "Amazon does not set a seller's price." However, Amazon will "suggest" that a seller lower its prices for an item "in certain instances – for instance, for something that is low in stock." (Attachment 2). Also, there are "guidelines requiring that the minimum price be higher than the Amazon referral fee." (Attachment 2).

Evidence has suggested that Amazon uses its Marketplace to spot new products to sell and exert more control over pricing. Whereas brick-and-mortar stores are generally only able to collect information on actual sales, Amazon tracks, inter alia, what shoppers are searching for, what they keep in their shopping basket, and what their mouse hovers over on the screen. "It is third-party sellers who bear the initial costs and uncertainties when introducing new products; by merely spotting them, Amazon gets to sell products only once their success has been tested." 126 Yale L.J. at 782-83.

On March 9, 2022, the U.S. House of Representatives' Committee on the Judiciary referred Amazon to the Department of Justice for its efforts and potentially criminal conduct to thwart the Committee in its efforts to uncover the truth about Amazon's business practices. (Attachment 4). The identified business practices included Amazon's competitive use of third-party seller data and Amazon's preferencing of its own products in search results. (Attachment 4).

In addition, an antitrust consumer class-action lawsuit against Amazon in the Western District of Washington, at Seattle, is gaining traction. *Deborah Frame-Wilson, et al. v. Amazon.Com, Inc.*, No. 2:20-cv-00424 (W.D. Wash). On March 24, 2023, the District Court granted in part and denied in part Amazon's motion to dismiss claims in the second amended complaint regarding a non-*per se* Section 1 violation of the Sherman Act, a 15 U.S.C. § 2 monopolization violation, a Section 2 attempted monopolization, and a Section 2 conspiracy to monopolize. [ECF 94]. (Attachment 5).

The plaintiffs in that case claim that Amazon has engaged in horizontal price-fixing with its 2 million third-party sellers, with respect to the products offered on the Amazon platform. The third-party sellers, according to Plaintiffs, are Amazon's "co-conspirators" that participate in Amazon's price restraints whether "involuntarily or under coercion." As such, the co-conspirators violate the Sherman Act by "consenting to the restraints and by selling at supracompetitive prices." [ECF 48, at 6].

The Amazon class action alleges that the horizontal price-fixing agreement with its sellers benefits Amazon, as it attracts more customers to the platform and avoids head-to-head competition between Amazon and other retail establishments, such as Ebay. The shoppers maintain that Amazon's policies hurt consumers. They claim that if it were not for Amazon, the eCommerce market prices for the products sold by its third-party sellers would be much cheaper. [ECF 48, at 8]; [ECF 94, at 4-6].

Although the foregoing may not be directly relevant to the task before this Court, context is important. A perfect storm is brewing in the eCommerce world that could initiate significant changes in Amazon's third-party retailer platform.

13

## IV. MR. BTESH'S SOCIAL BACKGROUND AND HISTORY

*"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."*

*Koon* v. *United States*, 518 U.S. 81, 113, 116 S. Ct. 2035 (1996).

* * * * * * * * * * * * * * * * * * * * * * * *

The Presentence Investigation Report sets out an accurate, although highly abbreviated summary of Mr. Btesh's social history.

Victor Btesh was born on July 10, 1968, in Brooklyn, New York. That year saw the assassination of Martin Luther King and Robert Kennedy. Racial violence broke out, and a battle over school decentralization in a Brooklyn district, Ocean Hill-Brownsville, ripped apart New York City.

Victor is the second of five children born to Marie and Albert Btesh. Three of his siblings live in New York and the oldest sibling lives in Florida. He is a lifelong resident of New York.

Victor's father was born in the United States. His paternal grandfather was born in Egypt, and his paternal grandmother had an eastern European background.

Victor's mother was born in Cairo, Egypt. After the founding of Israel in 1948 and the Arab-Israeli War, which followed soon thereafter, many Egyptian Jews emigrated abroad. In the 1950s, Egypt began to expel its Jewish population and confiscate Jewish-owned property. By 1950, approximately 40 percent of the Egyptian Jewish population

14

emigrated; some went to Israel, and the rest to other countries.  Victor's mother, Marie, was 12-years old at the time.  Some of the family went to Israel.  Marie went with two of her brothers, first to Greece and later to the United States.  Victor was named after his mother's youngest brother who was murdered during a home invasion as he was trying to protect his sister and nephew, David.  David had polio but went on to attend law school and have a successful career.  David, who passed away 20 years ago, became an important figure in Victor Btesh's life, particularly after Victor's parents divorced.  David shared with Victor his ability to "love life," even in a wheelchair and partially paralyzed.

Victor's parents met in Brooklyn at a local bowling alley.  Albert was 32-years old and Marie was 25 years old when they married.  Victor describes his father as a "salesman"; he was involved in retail sales, and his greatest success was in the hardware business, working at a True Value store.  Victor's mother maintained the home and was the primary caregiver to the children.  When Victor was old enough, his father took him on holidays and weekends to his various stores.  His father emphasized how important it was to pay attention to your business, and he taught Victor how to be on the lookout for shoplifters.

Maurice Terzi remembers when he and Victor started kindergarten.  There have been few times in the past 50 years when they were not in constant contact.  Maurice lived across the street from Victor's mother.  Maurice says that their group of friends have a "running joke while [they] are playing golf or going to a guy's night dinner that Victor is home with the kids and does not have time for us anymore."  (Attachment 6).

15

Maurice shares two stories with the Court to offer insight into Victor. About 35 years ago, Maurice had taken a sales job at a handbag company. In those times, there was no internet, Google, or Facebook. He was just told to "go sell." Victor volunteered to help; he arranged to drive with Maurice to Ohio and to meet with various retailers along the route; he mapped out the route, the hotels, and which customers to target. Victor even picked up all the travel expenses. Victor's generosity "left an indelible impression" on Maurice and set his career off on the "right path." (Attachment 6).

The second story is more recent. Victor is engaged to Katie, and one Sabbath, he brings his stepson Jojo to synagogue. They sit next to Maurice. Victor excuses himself, and Maurice begins asking Jojo what he likes to do. Jojo talks about doing things with his "dad." Thinking that Jojo was referring to his biological father, Maurice asks him where his father is. Jojo "sees Victor walk back into the room and stands up and points to him." Maurice said he was "blown away." (Attachment 6).

Victor's parents divorced when he was eleven-years old; they remarried 13 years later. Victor recalls his mother and father frequently arguing over financial matters. His father essentially abandoned the family, and under the terms of the divorce decree, he was ordered to pay little toward support. Victor did not speak with his father for about eight years. The divorce rate in Victor's community was low, and the family had to rely on a lot of charity and good will. He recalls it was a particular financial struggle to keep the children in private school.

Much later in life, other close family members in Victor's life also experienced divorce. Victor's niece, Madeline Szklarz, explains that her parents divorced when she was

16

six-years old.  Her father left, but "Uncle Victor was always there to help us."  (Attachment 7).  He helped financially and was there to celebrate birthdays and holidays.  She recalls a time, in 9th or 10th grade, when she did not want to go to school.

> He often drove us to school in the mornings, and when he came to wake me up, I will always remember him telling me that I am the smartest person and that I could accomplish anything that I want to if I put my mind to it.  I think about those words every single day.  Uncle Victor believes in me until today.

(Attachment 7).

Erica Goldstein, Madeline's older sister, was 14-years old when their parents divorced.  The hardest part for her was seeing her mom "give up" – "almost suicidal." (Attachment 8).  "Uncle Vic's" help was invaluable.

> If not for my Uncle Vic, I don't know where my family would all be today, probably homeless, and penniless.  My mother would probably not be alive.  My Uncle Vic helped my mother get back up on her feet.  He provided her with a flexible job . . . . But most of all, he gave her hope.

(Attachment 8).  Later in Erica's life, Victor hired her to work in his DVD store in Manhattan, and when he and Katie married, Victor had her work as a nanny in his home while she was pursuing her degree in education.  After her parents' divorce, Erica never wanted to get married, "but being around [Victor's] family changed me and made me want to have a family of my own."  (Attachment 8).

Victor nephew, Aaron Shaltiel, writes a similar account of Uncle Victor's financial and emotional assistance after Aaron's parent divorced post 9-11.  When Aaron's mother was diagnosed with cancer and their financial situation was dire, Victor helped move them in with Victor's mother; Aaron recalls that Victor paid the bills for them.  (Attachment 9).

17

When Aaron was 13-years old, Victor allowed him to work in the summer at Victor's retail stores in Manhattan. He started as a stock clerk and later became a cashier and key holder. The experience helped Aaron to mature. After high school, Aaron worked part-time at Victor's wholesale company while he attended college. Aaron is confident that he "would not be who [he] is today without [his] Uncle Victor." (Attachment 9).

Aaron's mother and Victor's sister, Belinda Btesh Shaltiel, offers that as far back as she can remember, "Victor has always helped to take care of our family." (Attachment 10). When she was in grade school, Belinda remembers that Victor would come home from work late at night and that sometimes he would work two jobs.

Like Victor, Belinda started working full time after high school. She met her husband at work. After she gave birth to Jason, Aaron, and Daniel, Belinda stopped working outside the house. Her husband opened a jewelry store in downtown Manhattan. Tragically, a short time after it opened, 9-11 occurred. The store was within walking distance of the twin towers, and Belinda's husband was forced to shut down the store as downtown New York City was shut down for a long time. (Attachment 10).

Belinda explains that her husband became very depressed and did not leave the house. Victor helped her obtain employment to support her family, but Belinda and her husband divorced. Her financial outlook was bleak, but Victor stepped in, moved her family to their mother's home, and paid the bills. Belinda fondly recalls Victor having dinner with them almost every Friday night and holidays and teaching their mother how to use a cell phone and computer and how to access Instagram and facetime.

18

Belinda was diagnosed with breast cancer in 2011-2012. She was very scared. She remembers Victor buying her a wig and driving her to cancer treatments whenever he could. Victor introduced her to a community group where Belinda made friends and found support. When Belinda's health improved, Victor got her a job interview with a company where she has been working for the past nine years. She was able to move out of her mother's house and have her own place. (Attachment 10).

Belinda speaks of Victor's positive influence on her children and his financial assistance. Belinda writes that Victor "has expressed remorse" for his crime on many occasions. She asks the Court to have leniency when sentencing Victor. (Attachment 10).

Despite that Victor encouraged his nieces and nephews to stay in school and pursue higher education, Victor was not particularly fond of school, in particular private school. Many of his school mates were from extremely wealthy families. Victor was embarrassed about his family's financial situation and wanted, more than anything, to be successful. Also, with private school, Victor's afternoons were an extension of the school day. His attended Yeshivah, a Jewish day school. With Yeshivah, 50 percent of the school day focuses on English, science, math, and social studies. The rest of the school day focuses on prayers, Torah studies, and history; these studies are mostly taught in Hebrew. The school day did not end until five o'clock.

Victor learned, however, that students who attended public school were dismissed in the afternoon, allowing them to pursue part-time jobs. When Victor started his freshman year at private school, he dropped out after orientation and enrolled in public school, James

19

Madison High School in Brooklyn. One of Victor's brothers and two friends also transitioned to public school.

In high school, Victor worked to help his mother financially and to earn his own money. Victor worked for his cousin and Uncle Sol in their electronics and gift store. He cleaned, swept floors, stocked items such as cameras and Sony Walkmans, and helped with customers. He took the subway to the store that was on Fifth Avenue and rode home with his cousin and uncle when the store closed.

In his freshman year of high school, Victor was mugged by scalpers near Madison Square Garden where he was trying to purchase tickets for a performance by the Go-Go's. Victor never felt the same about "street people." He was also physically harassed almost daily by another student in public school who would point a knife at him and demand a Dollar. For protection, Victor ingratiated himself with the football team members.

In high school, Victor developed a close friendship with Eddie Barnathan who had a car and whose father ran a business in Myrtle Beach, South Carolina. In the tenth grade, before classes ended in the spring, Victor went with Eddie to Myrtle Beach and worked in the beach store that Eddie's father owned. Victor remembers that time as fun filled, driving around, and chasing girls. He stayed in Myrtle Beach until the end of August. The next year, Victor again left before classes ended and went back to Myrtle Beach. This time, he and Eddie planned on going into business for themselves. Their first attempt failed. They brought merchandise from New York and managed to obtain a lot of orders from vendors in the Hilton Head area. Unfortunately, Eddie lost the order tickets. Next, Victor and Eddie approached Eddie's father with the idea of selling doctor "scrub tops." They started a

20

business with Eddie owning 50%, Victor owning 25%, and Eddie's father owning 25% of the business. Eddie and Victor did the leg work; they travelled around, showed the tops, placed the orders, and delivered the product. At the end of the summer, they had no profit to show because all of the money had been reinvested in the company. Eddie ended up buying Victor's 25% ownership share for $1,000.

Back in New York, Victor had a cousin, who was wheelchair bound and who worked with the Crazy Eddie consumer electronics chain of stores as an Executive Vice President. Through his cousin, Victor began working at a Crazy Eddie store in Queens. Victor secured a job for Eddie Barnathan at the store, and the two commuted to work together. Victor finally was transferred to the Manhattan store; he started by selling batteries and was promoted to video sales. Victor was approximately 17- or 18-years old. Victor left before the company's massive fraud became well known.[2] Victor thought about going back to school, and although he had obtained his GED, he scored too low to be accepted into college.

Victor worked for a time at Grand Central Cameras. He also worked for a few months at Abes of Maine in Brooklyn. Eddie Barnathan's father from Myrtle Beach, South Carolina had opened a retail store on Fifth Avenue that sold electronics and gifts. Victor left Abes and worked at that store for approximately two years. He met and sold products to a lot of celebrities. Victor left but returned soon thereafter. At the time, Victor recalls that his long-term plan was to manage a store where he could own a percentage of the business.

Eliot Azrak, a wealthy friend who Victor knew from Yeshivah, approached Victor one day and suggested that Victor would do well working in wholesale apparel. Joey Habert, another good friend, got Victor an interview with "Freeze" in New York City. Freeze was a relatively new company at the time, established in 1986 by principals Lou Shalam and Charlie Tebele. The company designed, manufactured, sold, and distributed licensed and private label clothing to national and overseas retail outlets. Freeze's licenses included movies, television, books, fashion brands, rock bands, and iconic legends that Freeze's design team then incorporated into fashion tops and bottoms. Victor interviewed with Lou and Charlie; he overcame their initial reluctance, and they hired him in the 1991/1992 time frame.

Lou and Charlie placed Victor in the girls' division where the person assigned to train Victor refused to help him. Victor struggled, and after a couple of months, Lou and Charlie told Victor that things were not working out and that they wanted to let him go. Victor, feeling like a failure, nevertheless went back the next day and worked the phones until he landed an order. He worked for free for about six weeks. On Fridays, Saturdays, and Sundays he worked at the retail store Eddie Barnathan's father owned to earn a little money.

Around 1990, Victor met Jason Steinberg. Jason is a talent manager, and he recalls selling Victor concert tickets. They have remained friends ever since then. They have lived through fun times but Jason, in particular, remembers the help Victor has given him over the years – not just once but many times.

---

[2] Crazy Eddie Antar and the Panama pump was a central theme in the movie, *The Accountant*, with Ben Affleck playing Christian Wolff, a mathematics savant making a living as a forensic accountant for

In 2009 when I had some financial setbacks. Victor was there to give me a job at his DVD shop, offering me a job with flexibility to help me get my business back on track . . . .Sadly, when I was forced to close my office in October of 2020, Victor offered with no hesitation, space at no charge. . . .

(Attachment 11). In asking for leniency for Victor, Jason summarizes his feelings for his friend: "He is that one person I know I can call and rely on if I have an emergency. I don't know what I would do without his kindness and generosity." (Attachment 11).

Lou and Charlie came around and ultimately offered Victor a job with a salary raise, promoted him, and reimbursed him for unpaid back salary. Victor was assigned to the boys' department and was doing well, when Eliot Azrak, his father Marvin, and Eliot's brother made Victor an offer around 1994/1995 to join their company, AME-American Marketing Enterprises. The business marketed licensed tee shirts. Victor was offered a position that paid commissions only, but he accepted the offer. Also, Marvin Azrak had just opened the first Harley Davidson Café in New York, and Victor recalls going to the Café a few times a week with customers.

Victor had a successful run at AME, particularly after Marvin Azrak heard about *Power Rangers* and obtained the contract to market boys sleepwear. Victor landed big sales for that product, which generated large commissions for Victor. Unfortunately, the company's principals then lowered his commissions. Victor next seized the initiative to sell girls *Power Ranger*s' sleepwear. He contacted K-Mart and secured a three-million-dollar order for AME. Victor's commissions were again lowered, and he finally left the company. Many years later, Li & Fung, the world's largest textile sourcing group, acquired sleepwear specialist AME for $128,000,000.

---

dangerous criminal organizations.

Victor secured his next employment in 1995/1996 with "Cougar." That company produced athletic activewear for men, including popular nylon athletic pants. Victor had salaried employment with Cougar. In 1995, Victor met Florence Chera at a Jersey Shore bonfire. The couple dated and then discussed marriage. Victor was 24-years old. Florence wanted to buy a house. Her father, Morris, offered to give the couple money to buy a house instead of financing a high-dollar wedding. Morris cautioned Victor that his daughter was very spoiled.

Victor's relationship with Florence's parents eventually soured. Morris did not think that Victor could financially support his daughter. Victor promised that one day he would own his own entertainment company, but Morris ridiculed Victor's dreams and ridiculed Victor for not being wealthy. The couple's relationship ended in 1996/1997, and Florence married shortly thereafter.

At that point, Victor was determined to make money, because, as he puts it, "no one wants you if you are poor." It became Victor's goal to own his own business by the time he was 30-years old. Cougar's investors, Victor learned, did not like how the business was being managed, with money being wasted on games, parties, and trips to Las Vegas. Victor knew his days were numbered. A childhood friend, Joey Habert, introduced Victor to Steve Russo, founder and CEO of FABNY, an apparel and accessories retail business in New York City. Steve offered Victor a position as a salesman in the accessories department, where he would be paid a salary and earn commissions.

Shortly before meeting Steve Russo, Victor had traveled to Las Vegas where he fortuitously met Kenny Dichter and Jesse Itzler, founders of Alphabet City Sports Records.

24

That label focused on creating and selling songs frequently heard in sports stadiums and arenas.[3]

Victor's employment with Russo was not long lived. Victor gave a three-weeks notice that he was leaving. Russo claimed that he fired Victor and refused to pay his commissions. Ken and Jessee gave Victor a home and allowed him to work out of their offices. They offered him a position with Alphabet City Sports Records, and Victor started selling music packages to different sports teams and various stores. Victor secured a lot of orders and created a "Non-Traditional" market for the product. Victor and another employee, Matt Streem, were the lowest compensated workers at Alphabet City. They decided to start their own business. Matt quit first and found store space on 22nd Street. Victor quit, and the day after July 4, 1998, when Victor was five days shy of turning 30-years old, Hot Records was born. Victor and Matt each contributed $5,000 to the company. Hot Records adopted the Oregon Ducks' Coach Willie Taggart's famous motto: "Blame No One. Do Something."

The year is 1999. As Adam Sternbergh in his <u>New York</u> magazine article, "Ten Long Years Ago . . ." reminds us, "No iPod. No smartphone. No YouTube. No Facebook. No Twitter. In 1999, the Internet was shiny-new and just out of the box . . . . We were just starting to figure out that the new search site Google, which had launched in 1998, might prove useful for something." *See* https://nymag.com/arts/all/aughts/62527/.

As for movies and television, Sternbergh reminisces:

---

[3] Kenny, it turns out, had a Midas touch for business. Alphabet City sold to SFX Entertainment in 1998 for $4.3 million dollars. Dichter then founded Marquis Jet in 2001, a fractional card jet program. He sold that company in November 2010 to a subsidiary of Berkshire Hathaway. A year earlier in 2009,

At the movies, it was a good year. It was a great year. In 1999 alone, you could have seen: *Being John Malkovich, Three Kings, Magnolia, Fight Club, The Limey, The Matrix, American Beauty,* or *South Park: Bigger, Longer & Uncut.* In his year-end review, David Edelstein—then at Slate, now at *New York*—wrote, "I think of this past year—the last year of cinema's first whole century—as the most hopeful since the 1970s." And it was true: It was the best, most innovative year for American movies in recent memory.

. . .Tina Brown and Harvey Weinstein launched *Talk* magazine with a lavish party on Liberty Island. *Friends* was the country's favorite comedy, a weekly infomercial for a whitewashed Manhattan. On HBO, *Sex and the City* celebrated the end of a successful first season. And the most popular TV show, and question, in America was *Who Wants to Be a Millionaire.*

*Id.*

Nearly two years later, on September 11, 2001, the Twin Towers fell. In the aftermath, as New York City rebuilt and rebounded, Hot Records made its presence known. Hot Records produced and marketed trendy products. Victor was the "idea" guy behind Hot Records' sales of videos of the 2004 Boston Red Sox World-Series win; sudoku books; CDs of hit Cheerleading mixes, and a line of Osbourne family action figures.

Victor married Beth Slavet in New York in 2002. They had no children, and the marriage was short lived. The couple divorced in 2004. Victor learned tragically that Beth committed suicide many years later during the COVID outbreak.

*The Apprentice* debuted on January 8, 2004. Tryouts for Season 2 were held not long after the show's debut. Victor managed to land an audition. Gwenda Blair in her book, <u>Donald Trump: Master Apprentice</u>, described what happened next:

---

Dichter and a business partner created the award-winning brand Tequila Avion. Dichter founded a private flight provider, Wheels Up, in 2013, and he took the company public in 2021.

26

Btesh didn't make it onto the show, but he had his own personal brush with fame when Donald walked over, shook his hand, and asked his name. "Afterward, everyone came over to me," Btesh said. "It was like suddenly I had become a celebrity." After his audition, Btesh, who had already learned that the Trump Organization executive in charge of licensing the name was Bernie Diamond, went over to Donald and told him that he had a great idea. When Donald said he didn't have a minute to listen, or even 20 seconds, Btesh asked for two seconds, then blurted out that he wanted to make a Donald Trump doll that says, "You're fired," he had a company that could do it, and he was supposed to talk to Mr. Diamond. "Call Bernie," Donald said. Btesh did so; eight months later, Donald sat in Toys R Us autographing the result.

*Id.* at 223 n.13 (Simon & Schuster 2005). (Attachment 12).

The company that Victor had in mind was Stevenson Entertainment Group LLC. Victor had been asked by Marty Krofft of Sid & Marty Krofft Pictures to introduce Stevenson to friends in the toy industry. Thanks to Victor, a deal was made between Stevenson Entertainment Group and the Trump Organization for a miniature Trump action figure. Victor recalls that Trump thought the doll's hair was "fantastic" but considered the suit to look "really cheap." Even so, on September 29, 2004, Trump appeared at a marketing event held at Toys R Us store in New York City's Times Square to promote the doll. (Attachment 13; Getty Images, retrieved June 29, 2023).

Michael Romano, the co-founder and CEO of the Stevenson Entertainment Group, has written on Victor's behalf. (Attachment 14). He met Victor in late 2002. Mike had left his position as a national sales manager of a Chicago company and headed to New York to attend the New York International Toy Fair hoping pursue a promising product line. Mike writes,

27

> Even though the business did not have the deep pockets that
> were on display throughout the toy industry at that time, and
> our "start up" struggles were many, Victor was always at the
> top of a very short list of people making every effort to help my
> small company get a hit. We had no arrangement, no contract,
> and no deal. I had a friendship with a man who himself had
> built a successful business who simply wanted to help.
>
> Well, a few years and many challenges later Victor selflessly
> delivered not one hit, but two homeruns. Victor had
> established a relationship with the Trump Organization and
> personally delivered to me a deal with NBC's "The Apprentice"
> starring Donald Trump as well as a national retail program for
> Mtv's The Osbourne's. I can say with every confidence that
> Victor Btesh was single handedly responsible, with no promise
> of compensation beyond a wholehearted thank you; for
> catapulting our small company's growth.

(Attachment 14).

Mike's friendship with Victor has continued over the years. As Victor always made
Mike feel that he truly admired Mike's wonderful family, Mike, too, has enjoyed watching
Victor "grow in to one of the most dedicated and loving husbands and fathers you could
imagine." (Attachment 14).

Mike concludes his letter by sharing his personal battle with generalized anxiety Bi-
Polar depression that began in 2016. Victor contacted him "out of nowhere just to say
hello" after the onset of his depression, and Victor has made "exceptional efforts to
encourage" Mike. To punctuate for the Court how important it was for him to share his
experiences with Victor, Mike writes that he struggles with almost debilitating depression
that makes it difficult for him even to complete his letter. "However, I want you to
understand just how important . . . [i]t is to help illustrate the character of my dear friend."
(Attachment 14).

Another long-term friend, Douglas Goodstein, adds his voice to others who have experienced Victor's willingness to extend a helping hand, even to strangers. Douglas shares a specific instance in the early 2000s that illustrates Victor's generosity.

> During a time in the early 2000's when my wife was looking for employment after being laid off, Mr. Btesh, without hesitation, offered her a job within his organization. This act of kindness not only alleviated the financial burden on my wife and I, but also provided her with a renewed sense of purpose and stability. It is through his selflessness and willingness to lend a helping hand that had positively impacted our lives during that time.

(Attachment 15).

Michael Romer, recalls meeting Victor in the early 2000s. Michael has a Bachelor of Arts Degree from Brandeis University and a law degree from Brooklyn Law School. He is an entrepreneur in the hospitality, beverage, and beauty world. Michael wryly writes that Victor has seen him give away more engagement rings than Tom Brady has won rings; adopt more dogs than MC Hammer had dancers; live in a studio apartment and a penthouse; and be a nightclub promoter and the CEO of a publicly traded company. As other people have written about Victor, Michael says that Victor would introduce him "to everyone to bolster [his] career and always support many of [his] events and hospitality ventures by attending with groups of his colleagues." Michael says, Victor "would never ask for anything on the house, preferring to support my vision as a guest and paying." (Attachment 16).

Michael has always admired Victor's work ethic, even when the work was less than glamourous. He remembers that Victor "had a store front in New York City in one of the most challenging economic times in a post 9-11, pre-recession Manhattan." (Attachment

16). He asks the Court to punish Victor fiscally but not take him away from those whose lives he has touched.

From 2004 through 2007, Victor developed a market selling DVDs. The year is 2006, and Victor met Elliot Chrem. Elliot describes Victor as "selfless, considerate and decent." (Attachment 17). Elliot also credits Victor for encouraging him to follow his dreams, which has led Elliot to being a personal chef running a successful catering business out of Brooklyn. Elliot interviewed with Victor for a managerial position with one of Victor's DVD stores. He recalls:

> We had a conversation where Victor basically said, "Look Elliot, I can definitely hire you to do this job – but why aren't you doing the thing that you REALLY want to do? You've already got a talent that could be successfully turned into a business of your own."

(Attachment 17). Victor helped Elliot with a community website, and Victor encouraged friends to write testimonials. Victor never asked him for anything in return. Elliot asks the Court to take these matters into consideration in sentencing Victor.

Elliot's wife, Elisa, has written separately to the Court. She has been the principal of Imagine Academy for Autism since 2008. In terms of sentencing Victor, she offers the Court her observations and experiences with Victor as a volunteer at her academy. Her first impression of Victor rings true for many: "When I first met Victor the thing I noticed was his height, he seemed like an opposing presence with a deep voice and an intense focus." (Attachment 18).

According to Elisa, Victor has a gift for working with students with special needs:

> Victor Btesh is kind, caring and has a way of reaching across the divide to connect with students with severe communication

30

deficits, not an easy task. You have to have a certain personality . . . it has to be genuine or the kids will rat you out, they know. He's real, they get it . . . They are all drawn to him.

(Attachment 18). Elisa welcomes Victor to continue volunteering for as long as he is available to do so.

As part of his efforts to develop a market selling DVDs, Victor purchased a lot of so-called "Chick-Flick" videos. Victor met with Bed, Bath and Beyond buyers at their headquarters in New Jersey. Bed, Bath and Beyond initially wanted to test market the videos in 50 stores; that number quickly increased to more than 850 stores. Financial problems developed because Victor had agreed that Bed, Bath and Beyond could pay within 90 days, rather than the standard 30 or 60 days, because it was a new company. Other financial pressures mounted related to a Hot Records' loan for $250,000 that Victor obtained and guaranteed to buy Matt Streem out of the partnership when Matt married and moved.

Around 2008, the Michelle's DVD Funhouse concept was developed. Michelle is Victor's sister. Victor rented short-term retail store spaces. His mother managed and sold at first, but later his sister Michelle took over. Chronic problems included employee theft and store robberies. When Victor married Katie, he wanted to spend time with her and her son, and he decided to close the retail storefronts. That decision led to offering DVDs and other merchandise for sale on Amazon.

Victor's youngest sister, Michelle, has written on behalf of her brother. She shares two instances in which Victor was more concerned about people than money. The first instance concerns their brother Michael who has struggled with drug addiction and mental

31

health issues all of his life. Victor helped Michael get established with an apartment, clothes, and a vehicle. Victor also gave him a job at his retail stores. Victor later discovered that Michael was stealing from the cash register and stealing inventory to sell to competitors. Even when Michael was caught on video with a truck full of Victor's videos, Victor declined to press charges. Michelle writes that Victor "never cared about the financial damage it caused him. He was more concerned about our brother's well-being and mental health." (Attachment 19).

The second instance Michelle relates is when Victor finally bought himself a car. "[M]y sister and I took it and crashed it. I think everyone would have been very angry. Instead, he was more worried about our well being and that we were ok. He didn't seem to care about the cost of fixing the damaged car." (Attachment 19).

From these events, Michelle candidly questions if Victor did not care about the money, then, "why did he commit a crime and act that way?" (Attachment 19). Michelle is still searching for an answer that makes sense.

Michelle also went through a painful divorce with devastating economic consequences. She knew that Victor named his DVD store, Michelle's DVD Funhouse, after her to help give her purpose and get back on her feet. (Attachment 19). Michelle asks the Court to keep Victor at home with his family.

Corey Winters worked with Victor Btesh for almost 15 years, from 2001 to 2015. Corey met Victor in 2000 when he was working in Minneapolis, and Victor recruited him to join Victor's company as an Operations Executive. Corey remembers Victor's assistance

32

"with the multitude of small things involved in the transition to life in a new city."
(Attachment 20).

Corey writes that Victor took care of his employees and checked in on their out-of-town parents. Victor made sure his employees had good health insurance and encouraged employees who achieved success with side projects, including employees who had formed a musical band and took extended international tours. According to Corey, "Their jobs were always waiting for them when they got back." (Attachment 20).

Corey shares his insights from years spent with Victor. He believes "the element that most speaks to the essence of Victor Btesh is 'family,'" and in particular Victor's reaction to the death of his father in 2001. It left a "lasting impression of what he truly held valuable. (Attachment 20).

> I won't type out all of the involved customs of what I came to know as Sheloshim and Shanah from the Jewish faith, but they combine to last for twelve months, and at their heart call for praying in a group of ten people three times a day, each day, for a year . . . . I watched him realize this "duty", as he dealt with his grief as well as the responsibilities of running a business, to say nothing of navigating the daily challenge of finding ten fellow prayers wherever he happened to be that day. Seeing Victor so dedicated to the rituals was inspiring both in appreciating the effort it took to observe for a year, as well as how it provoked self-reflection on one's own relationships.

(Attachment 20).

Turning to more recent times, Corey reflects on Victor's devotion to his own family. He asks the Court to consider "how important his involvement and presence is in their lives and in the kids' development." (Attachment 20).

Eric Markowitz has known Victor Btesh for over 20 years. Eric, in fact, was a friendly competitor on the FBA Amazon Marketplace where he was selling DVDs and Blu-rays. Eric, knowing of Victor's current conviction, was shocked because Victor "never once asked to change the price of a DVD or Blu ray, or even discussed selling price on Amazon." (Attachment 21). From recent interactions, Eric has witnessed Victor's "exceptional remorse for his actions and a genuine desire to make amends for any harm caused." (Attachment 21). Having known Victor for such a long time, Eric firmly believes there are numerous alternatives to incarceration that will benefit not only Victor but also the community at large.

Another long-time friend, Ralph Shamah, has written on Victor's behalf. Ralph knows Victor's mother and how close she and Victor are. "So I often see her eating by Victor's house and playing with his kids. Victor cherishes his mother and he has taught his children to do so as well." (Attachment 22). Ralph has also been so impressed with how Victor has built a life with his wife, Katie, and how committed he is to his stepson, Jojo. "Victor loves Jojo and treats him better than most fathers treat their own sons." (Attachment 22).

Other than Victor's family, the person who perhaps knows Victor best is Joey Habert. He and Victor were born weeks apart, and their mothers were friends. When they were toddlers, Victor and Joey played at each other's homes; they celebrated birthdays together. Joey remembers when Victor's parents divorced and how the divorce "put a lot of pressure" on Victor. (Attachment 23). Victor's mother would ask Joey to come over and help Victor with his homework. Joey writes that Victor "introduced [him] to funny TV shows, explained

34

sports to [him], . . . shared his comic books[, and] introduced [him] to the world of music, which led to [Joey's] career as a successful DJ."  (Attachment 23).

When it was time for high school, Victor went to public school while his buddies went to Yeshiva.  Joey knew that during this time Victor was also working odd jobs to help his family.  Then when Victor's buddies graduated high school and went to college, Victor started working full time to support his family.  Joey admits being amazed that Victor "would constantly be taking out money from his earnings and giving it to his mom, while I would go to my dad for allowance each week."  (Attachment 23).

As do all of Victor's long-time friends, Joey was delighted and excited when Victor and Katie married.  Joey has seen how Victor has showered love, attention and care on Katie's young son, Jojo.  Joey attended Jojo's bar mitzvah this year.  Joey says it was good to see both Victor and Jojo's biological father together being respectful throughout the celebration.

Joey concludes his letter by asking the Court to have mercy on Victor when he is sentenced.  The man that Joey has known all of his life does not need jail time for remorse or to prevent him from future criminal behavior.  (Attachment 23).

The most transformative events in Victor Btesh's life have been his marriage to Katie, his stepson Jojo, and the three girls that Victor and Katie share.  With his family, Victor has found happiness, purpose, and acceptance, unlike anything he has before experienced.

Katie's letter to the Court provides much insight into Victor.  "Victor," she writes, "is the reason I believe in hope, second chances and new beginnings."  (Attachment 24).

They met in Spain in 2006; after returning they would run into each other because they lived in the same residential building in Manhattan.

Victor and Katie developed a friendship, but her life was to take a different path. Owing to her father's terminal cancer and his wish to see Katie marry, Katie abruptly married her current boyfriend in 2007. It was not a good marriage, but for Katie it gave her a son, Jojo. She divorced and became the primary caregiver for her son. (Attachment 24).

After Victor learned she was single, he reached out to her, and they began dating.

> I was immediately attracted to Victor's charm, humor, vibrant nature, positivity, and his up-beat personality. He was outgoing, friendly, and he never passed judgment on anyone. I was not looking for a new relationship when Victor came into my life, yet I fell in love with him. I found myself feeling safe and happy for the first time in a long time.

(Attachment 24).

Katie explains how Victor formed an immediate bond with Jojo and took on the challenges of parenting naturally and instantaneously. For Katie, "that is one of the reasons why we decided to have three more children: Marie is 8-years old; Ruby is 7-years old; and Oliva just turn 4-years old.[4] According to Katie, Victor "is the driving force that helped Jojo build a relationship with his natural father, his grandfather, and other members of the Falack family." (Attachment 24).

Victor has encouraged Katie in her career as a full-time ELA teacher and director of her school's writing center. Equally important to young women with their hands full juggling work and family, Victor realized Katie's need for some fun. He motivated her to join a

---

[4] The day this Sentencing Memorandum is being submitted, July 10, 2023, Victor turns 55-years old.

softball league, which she has very much enjoyed; whenever he can, Victor attends the games and cheers in the stands. (Attachment 24).

Katie's letter captures the puzzlement and distress of those indicted in the federal system who because of the intricacies of conspiracy law, are called away to a foreign place to defend themselves. Victor's persona is Brooklyn "writ large," and Katie shares Victor's concerns that his persona will be misunderstood in Knoxville, Tennessee. (Attachment 24).

Katie also shares Victor's agony about the consequences of his conduct on his family.

> Since Jojo was a little boy, we had dreams to have a holy and spiritual experience for his Bar Mitzvah in Jerusalem, Israel. That was not allowed to happen. Next Spring Jojo will graduate from elementary school, and Victor is worried that if he must to away to prison, he will miss that too. Already, he will never forgive himself for ruining our plan to take our family to Israel. He loves Jojo so much, and he feels as if he failed him. He knows we love him no matter what. Jojo does not know anything about the case; he trusts and loves Victor because Victor has always been there for him.

(Attachment 24).

Katie concludes her letter by asking the Court to give Victor a second chance and grant him leniency. [5]

---

[5] Collective Attachment 25 to this Sentencing Memorandum contains additional heartfelt letters from family members and friends attesting to Victor Btesh's character and devotion to his family and his community.

37

## V. NATURE AND CIRCUMSTANCES OF THE OFFENSE

Subsection (a)(1) of 18 U.S.C. § 3553 also directs the Court to consider the nature and circumstances of the offense.

As opposed to investigating whether a violation of 15 U.S.C. § 1 has occurred, proving at trial a criminal violation of 15 U.S.C. § 1 is not particularly complicated. A review of the American Bar Association Model Jury Instructions in Criminal Antitrust Cases (2009) shows that a jury should be instructed that the elements of a 15 U.S.C. § 1 violation are: (1) the conspiracy described in the indictment existed at or about the time alleged; (2) the defendant knowingly became a member of the conspiracy; and (3) the conspiracy described in the indictment either affected interstate [and/or foreign] commerce in goods or services or occurred within the flow of interstate [and/or foreign] commerce in goods or services.

The jury should further be instructed that if it finds that the government has met its burden with respect to these elements, the jury

> need not be concerned with whether the agreement was reasonable or unreasonable, the justification for the agreement, or the harm, if any done by it. It is not a defense that the parties may have acted with good motives, or may have thought that what they were doing was legal, or that the conspiracy may have had some good results. If there was, in fact, a conspiracy as charged in the indictment, it was illegal.

The jury should also be instructed that if it finds that the defendant entered into an agreement to fix prices,

> the fact that the defendants or their conspirators did not abide by it, or that one or more of them may not have lived up to some aspect of the agreement, or that they may not have been

38

successful in achieving their objectives, is no defense. The agreement is the crime, even if it is never carried out.

Evidence that the defendants and alleged conspirators actually competed with each other has been admitted to assist you in deciding whether they actually entered into an agreement to fix prices. If the conspiracy charged in the indictment is proved, it is no defense that the conspirators actually competed with each other in some manner or that they did not conspire to eliminate all competition. Nor is it a defense that the conspirators did not attempt to collude with all of their competitors. Similarly, the conspiracy is unlawful even if it did not extend to all products [services] sold by the conspirators or did not affect all of their customers.

Measured by the legal yardstick outlined above, Victor Btesh's criminal conduct is not particularly or especially outrageous, aggravated, notorious, or nefarious.

Research from the website of the Antitrust Division of the Department of Justice discloses that on April 6, 2015, the DOJ Office of Public Affairs announced: "A one-count felony charge was filed today in the U.S. District Court of the Northern District of California in San Francisco against David Topkins. According to the charge, Topkins and his co-conspirators fixed the prices of certain posters sold online through Amazon Marketplace from as early as September 2013 until in or about January 2014." The Public Affairs release continued: "Today's announcement represents the division's first criminal prosecution against a conspiracy specifically targeting e-commerce," said Assistant Attorney General Bill Baer of the Department of Justice's Antitrust Division." (Attachment 26). Topkins agreed to being charged by Information and entered into a plea agreement. He was sentenced on March 16, 2017, to a sentence of probation for a term of three years. By agreement a fine of $20,000 was imposed. *United States v. David Topkins*, No. CR15-CR-00201 (N.D. Calif.) [ECF, 1, 6, 7, 29].

39

Another co-conspirator, Daniel William Aston, a former e-commerce executive, pleaded guilty on January 17, 2019, for conspiring to fix the prices of posters sold online. Aston, a resident and citizen of the United Kingdom, was indicted by a federal grand jury in the Northern District of California on August 27, 2015. Aston was a fugitive until his arrest in Spain in May 2018. After his arrest, he spent over five months in Spanish custody before agreeing to submit to U.S. jurisdiction and answer to price-fixing charges. He was sentenced to six months imprisonment, with credit for time served in Spanish custody. No criminal fine was imposed by agreement. *United States v. Daniel William Aston*, No. 3:15-CR-00419 (N.D. Calif) [ECF 73, 75].

The DOJ Office of Public Affairs announced on January 28, 2019:

> "Today's announcement represents another successful development in the Division's first online marketplace prosecution involving algorithmic pricing tools and a warning to fugitives who attempt to evade prosecution," said Assistant Attorney General Makan Delrahim of the Department of Justice's Antitrust Division. "Americans shopping online, like all consumers, deserve the benefit of a market free from collusion."

(Attachment 27).

Research discloses a third, eCommerce antitrust conspiracy prosecuted by the Antitrust Division that did not involve Amazon Marketplace. Akil Kurji was the owner of an online retail company that specialized in the sale of customized promotional products, such as wristbands, lanyards, temporary tattoos, and buttons. *United States v. Akil Kurji*, No. 4:18-CR-00655 (S.D. Tex.). He entered into a plea agreement with the government on April 11, 2019. [ECF 27]. The base offense level stated in the plea agreement was 12; a two-level increase for volume of commerce over $1,000,000 was agreed to; a four-level

increase for aggravating role adjustment was agreed to. The combined offense level was 18, with a contemplated three-level downward adjustment for acceptance of responsibility. A fine of $20,000 was part of the plea agreement. [ECF 27]. He was sentenced June 27, 2019. [ECF 43]. The District Court sentenced Kurji to a term of imprisonment of eight months and imposed a fine of $20,000. [ECF 43].

From the foregoing, it appears that the David Camp, Morris Sutton, Emmanuel Hourizadeh, Raymond Nouvahian, Bruce Fish, Victor Btesh, and unindicted co-conspirators group is only the second publicized, legal foray by the Antitrust Division into the criminal practices of third-party sellers on Amazon Marketplace. As such, these cases occupy a unique spot in the antitrust world – not unique in terms of the criminal conduct involved, i.e., price fixing, but unique as a point of criminal prosecution focus.

Victor Btesh and his businesses violated federal law. He admitted being part of a price-fixing conspiracy operating on the Amazon Marketplace platform in connection with the sale of DVDs and Blu-ray discs. He has accepted responsibility for his criminal conduct. His conduct did not involve use of a special skill or abuse of a position of trust. It did not threaten public health or otherwise endanger public safety. Victor Btesh has no prior criminal history.

41

## VI.  KINDS OF SENTENCES AVAILABLE

Subsection (a)(3) of 18 U.S.C. §3553 directs the Court to consider the kinds of sentences available.  The statutory range of incarceration for a violation of 15 U.S.C. §1 is not more than ten (10) years.  No minimum, mandatory term of imprisonment applies.  As a Class C felony, 18 U.S.C. § 3559(a)(3), a sentence of probation is statutorily available.  If the applicable guideline range falls in Zone C or D of the Sentencing Table, however, probation is not a sentencing option.  USSG § 5B1.1, comment (n.2).

## VII.  ADVISORY GUIDELINES CALCULATIONS

Subsection (a)(4) of 18 U.S.C. § 3553 directs the Court to consider the advisory sentencing guidelines.  This advisory guideline range, however, is but one factor in 18 U.S.C. § 3553 that the Court is directed to consider in arriving at a sentence sufficient, but not greater than necessary, to achieve the sentencing purposes.  Indeed, as the United States Supreme Court emphasized in *Nelson v. United States*, 129 S. Ct. 890 (2009),

> Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.  In Rita we said as much, in fairly explicit terms: "We repeat that the presumption before us is an appellate court presumption. . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." [*Rita v. United States*,] 551 U.S., at 351, 127 S. Ct. 2456, 168 L. Ed. 2d 203 [(2007)].  And in Gall v. United States, 552 U.S. 38, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007), we reiterated that district judges, in considering how the various statutory sentencing factors apply to an individual defendant, "may not presume that the Guidelines range is reasonable."  Id., at 50, 128 S. Ct. 586, 169 L. Ed. 2d 445.

*Nelson*, 129 S. Ct. at 892.

<u>Presentence Investigation Report:  Advisory Guidelines Calculation</u>

Consistent with the parties' plea agreement, the United States Probation Office used the guideline for a violation of 15 U.S.C. § 1 found in USSG § 2R1.1.  Also consistent with the plea agreement, a base offense level of 12 was applied, and a two-level increase for a volume of commerce more than $1,000,000 but less than $10,000,000 was assessed.  The plea agreement recites that the parties do not agree as to the applicability of an aggravating role pursuant to USSG § 3B1.1, and the parties are free to advance any arguments and evidence in support of or in opposition to whether and how USSG § 3B1.1 applies.  The Presentence Investigation Report recommends applying a four-level role-adjustment increase, pursuant to USSG § 3B1.1(a), on the basis that Mr. Btesh was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  With a three-level downward adjustment under USSG § 3E1.1(b) for acceptance of responsibility, Mr. Btesh's Total Offense Level would be 15.  With a Criminal History Category of I, the advisory Guidelines range is 18 to 24 months imprisonment, a sentence that falls within Zone D on the Sentencing Table.[6]

---

[6] From the plea agreements that have been filed for Mr. Btesh's co-conspirators awaiting sentencing, it appears that Morris Sutton's advisory sentencing guideline range is 10 to 16 months (Level 12), with a Criminal History Category I; that Raymond Nouvahian's advisory sentencing guideline range is 12 to 18 months (Level 13), with a Criminal History Category I; that Emmanuel Hourizadeh's advisory sentencing guideline range is 12 to 18 months (Level 13), with a Criminal History Category I; and that Bruce Fish's advisory sentencing guideline range is 10 to 16 months (Level 12), with a Criminal History Category I.

<u>Aggravating Role in the Offense</u>

Mr. Btesh filed an objection to the recommended 4-level aggravating role adjustment. He maintains that he does not meet the factual or legal definition of an organizer or leader.

To qualify as a leader or organizer, a defendant "must have exerted control over at least one individual" within the conspiracy. *United States v. Gort-Didonato*, 109 F.3d 318, 321 (6th Cir. 1997). It is not enough to be an essential part of the conspiracy or manage its property. *United States v. Christian*, 804 F.3d 819, 824 (6th Cir. 2015); *United States v. Vandeberg*, 201 F.3d 805, 811-12 (6th Cir. 2000).

Relevant factors in finding a leadership or organizational role include "the exercise of decision making authority . . . and the degree of control and authority exercised over others." USSG § 3B1.1, cmt. n.4. A participant is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.* § 3B1.1, cmt. n.1. In the Sixth Circuit, a participant includes those "who were (i) aware of the criminal objective, and (ii) knowingly offered their assistance." *United States v. Anthony*, 280 F.3d 694, 698 (6th Cir. 2002).

In determining whether an aggravating role adjustment is appropriate, sentencing courts often have consulted, inter alia, the factual basis set out in a defendant's plea agreement. *See, e.g., United States v. Alepin*, 296 Fed. Appx. 509, 514 (6th Cir. 2008).

44

The factual basis of the plea agreement in this case provides in Paragraph 4:

(a)    For purposes of this Plea Agreement, the "relevant period" is that period from at least October 2016 and continuing until at least October 29, 2019. During the relevant period, the defendant operated three Amazon Marketplace storefronts with business addresses located in Brooklyn, New York, and was responsible for establishing the storefronts' pricing. During the relevant period, the defendant was a distributor and seller of DVDs and Blu-Ray Discs and sold DVDs and Blu-Ray Discs through the storefronts on the Amazon Marketplace. DVDs and Blu-Ray Discs are forms of optical disc storage and the Amazon Marketplace is an e-commerce platform owned and operated by Amazon.com, Inc. ("Amazon") in the United States that enables third-party vendors to sell new or used products alongside Amazon's own offerings. The Amazon Marketplace is a component of the Amazon.com website. During the relevant period, the defendant delivered DVDs and Blu-Ray Discs to Amazon locations for further distribution to purchasers located throughout the United States. The defendant's affected sales to customers throughout the United States of DVDs and Blu-Ray Discs sold through the Amazon Marketplace totaled at least $1,900,000.

(b)    During the relevant period, the defendant participated in a conspiracy with other persons and entities engaged in the sale and distribution of DVDs and Blu-Ray Discs through the Amazon Marketplace, the primary purpose of which was to suppress and eliminate competition for the sale of DVDs and Blu-Ray Discs sold in the Amazon Marketplace by fixing prices of DVDs and Blu-Ray Discs sold through the Amazon Marketplace platform to customers throughout the United States. In furtherance of the conspiracy, the defendant engaged in discussions, transmitted across state lines both orally and electronically, with representatives of other sellers of DVDs and Blu-Ray Discs on the Amazon Marketplace. During these discussions, the defendant and his conspirators reached agreements to suppress and eliminate competition for the sale of DVDs and Blu-Ray Discs sold in the Amazon Marketplace by fixing prices for DVDs and Blu-Ray Discs sold through the Amazon Marketplace to customers throughout the United States.

45

(c)    During the relevant period, the defendant and other conspirators sold DVDs and Blu-Ray Discs through the Amazon Marketplace in various ways, and payments for DVDs and Blu-Ray Discs sold by the defendant and his conspirators through the Amazon Marketplace traveled in interstate commerce. The business activities of the defendant and his conspirators in connection with the sale of DVDs and Blu-Ray Discs sold through the Amazon Marketplace that were the subject of this conspiracy were within the flow of, and substantially affected, interstate trade and commerce.

(d)    Acts in furtherance of this conspiracy were carried out within the Eastern District of Tennessee. Such acts included multiple instances in which the defendant, while located outside of the Eastern District of Tennessee, agreed with a conspirator operating a storefront in Sweetwater, Tennessee to raise prices on DVDs and Blu-Ray Discs in furtherance of the conspiracy.

[ECF 68].  To be sure, the plea agreement states that the foregoing does not necessarily constitute all of the facts in the case.  While not dispositive, they are, however, a relevant consideration, and they do not set out an aggravating role for Mr. Btesh.

46

PENDING REQUEST TO BE FILED UNDER SEAL

PENDING REQUEST TO BE FILED UNDER SEAL

PENDING REQUEST TO BE FILED UNDER SEAL

PENDING REQUEST TO BE FILED UNDER SEAL

PENDING REQUEST TO BE FILED UNDER SEAL

PENDING REQUEST TO BE FILED UNDER SEAL

PENDING REQUEST TO BE FILED UNDER SEAL

PENDING REQUEST TO BE FILED UNDER SEAL

PENDING REQUEST TO BE FILED UNDER SEAL

PENDING REQUEST TO BE FILED UNDER SEAL

## VIII. GENERAL PURPOSES OF SENTENCING

Subsection (a)(2) of 18 U.S.C. § 3553 directs the Court to consider the general purposes of sentencing to include: seriousness of the offense, just punishment, respect for the law, and specific and general deterrence. 18 U.S.C. § 3553(a)(2)(A), (B), (C).

A. <u>Seriousness of the Offense</u>

Federal sentencing law essentially asks a sentencing court to consider retribution, deterrence, incapacitation, and rehabilitation. "Retribution imposes punishment based on moral culpability, whereas deterrence, incapacitation, and rehabilitation are directed towards society's future security." *United States v. Stern*, 590 F. Supp. 2d 945, 956 (N.D. Ohio 2008). Seriousness of the offense falls under retribution. Respect for the law falls under both retribution and general deterrence. Just punishment for the offense falls under retribution. Adequate deterrence to criminal conduct falls under general deterrence. Protection of the public from further offenses of the defendant falls under specific deterrence. *See United States v. Cole*, 622 F. Supp. 2d 632, 637 (N.D. Ohio 2008).

Inasmuch as seriousness of the offense falls under retribution, the focus is on Victor Btesh and the seriousness of his personal offense conduct. In terms of offense levels and advisory sentencing guidelines, seriousness is driven foremost by volume of commerce. In this case, the government and Mr. Btesh agreed in the plea agreement upon a volume-of-commerce figure of $1.9 million, which adjusted the base offense level from 12 to 14. All of which is to say that antitrust price-fixing is a serious offense. Congress tells us that much. But, as pointed out earlier in this sentencing memorandum, neither Mr. Btesh's conduct nor that of indicted and unindicted conspirators are typical of antitrust prosecutions. Mr.

57

Btesh's conduct did not threaten the health of our citizens or result in death (which is certainly more than can be said of insulin manufacturers' price-fixing schemes). Nor did his conduct detrimentally affect the ability of our citizens to buy food or gasoline or provide for other basic necessities.

B. Promoting Respect for the Law and Just Punishment

Turning next to promoting respect for the law and just punishment, those sentencing considerations are promoted by "punishments that are fair, however, not those that simply punish for punishment's sake." *United States v. Stern*, 590 F. Supp. 2d 945, 956 (N.D. Ohio 2008).

There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist. *See United States v. Zavala*, No. 07-14851, 300 Fed. Appx. 792, 2008 U.S. App. LEXIS 24168, at *8-9 (11th Cir. Nov. 25, 2008 ("[A]ny higher sentence would promote disrespect for the law.") (quoting the district court); *United States v. Ontiveros*, 07-CR-333, 2008 U.S. Dist. LEXIS 58774, at *6 (E.D. Wis. Jul 24, 2008) ("[A] sentence that is disproportionately long in relation to the offense is unjust and likewise fails to promote respect [for the law].") 590 F. Supp. 2d at 957.

Senior District Court Judge John Kane perhaps explained the tension best in *United States v. Rausch*, 570 F. Supp. 2d 1295 (D. Colo. 2008):

> Punishment is unpleasant and inflicted on an offender because he has committed an offense. It is not merely the inevitable consequence of a person's voluntary action, but rather the

58

union of the individual's conduct with the recognition by society that its rules have been violated. . . .

The retributivist approach, advocated by the prosecution in this case stresses guilt and dessert, looking back to the crime to justify punishment and denying or ignoring that the consequences of punishment have any relevance to its justification. On the other side of the coin, the utilitarian approach taken by defense counsel insists that punishment is justified only if it has beneficent consequences that outweigh the intrinsic evil of inflicting suffering on another human being.

Lord Justice Denning, the great English jurist, has called punishment "the emphatic denunciation by the community of a crime." In his view, and I see great value in it, punishment reinforces the community's respect for its legal and moral standards. The restraint on this principle, however, is that punishment is only justifiable when it is deserved. . . . Even [when deserved], the utilitarian assertion is that every human being should be treated with at least a minimum of respect as a source of rights and expectations and not merely as an instrument for promotion of the social order.

570 F. Supp. 2d at 1303-04.

In this case, promoting respect for the law and just punishment can be accomplished without imposing a lengthy term of incarceration.

## C. Specific Deterrence and General Deterrence

Among the 3553(a) factors is the need for the sentence imposed "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B), (C). Neither of these factors weighs heavily in favor of a lengthy sentence for Victor Btesh.

An incarcerative sentence is not necessary to afford "specific" deterrence – sometimes referred to as "incapacitation" – to Victor Btesh committing any future crimes. Mr. Btesh poses no danger to the public.  Prior to the events leading to the federal

59

prosecution, Mr. Btesh had a spotless criminal record. The significant losses and collateral consequences brought about by his conduct are more than adequate to satisfy any specific deterrence concerns. He has been struggling since Amazon removed him from the Marketplace after his guilty plea. Now that he has a felony conviction, his employment prospects are limited unless he can continue some type of self-employment. He and his businesses will be fined a considerable amount of money, and he has expended considerable resources pursuing his defense. He also has suffered the humiliation of rumors and innuendos about his conduct and associations.

As for general deterrence, it has been held to be a valid sentencing consideration, *see United States v. Phinazee*, 515 F.3d 511 (6th Cir. 2008). It is not, however, an imperative sentencing consideration in this case in terms of ordering an incarcerative sentence for Victor Btesh.

Research reveals little concrete guidance on assessing general deterrence. United States District Judge James Gwin undertook a somewhat philosophical discussion of general deterrence within the framework of 18 U.S.C. § 3553 in connection with issuing his Sentencing Memorandum for Robert G. Cole. *See United States v. Cole*, 622 F. Supp. 2d 632 (N.D. Ohio 2008). "General deterrence," he observed "uses a utilitarian calculation, subjecting defendants to longer periods of incarceration than retribution requires to 'send a message' to other potential offenders.'" 622 F. Supp. 2d at 638. This calculation creates "a tension between individual dignity and societal good, begging the question: Is it ethical to impose a greater-than necessary punishment upon an individual criminal defendant to protect society at large?" *Id.*

60

Judge Gwin contrasted Jeremy Bentham's belief that general deterrence alone justifies punishment and should be the chief end of punishment with Kant's and Hegel's views (a) that judicial punishment should never be administered "merely as a means for promoting another Good," because "one man ought never to be dealt with merely as a means subservient to the purpose of another" and (b) that "punishment must be derived from the from the criminal's own acts." *Id.* at 639. From these contrasting views, District Judge Gwin reasoned that the "philosophical underpinnings of general deterrence thus create problems in the sentencing context." *Id.*

Putting aside philosophical differences, District Judge Gwin further observed that general deterrence "also suffers from potential economic inefficiencies," and "with the United States having the highest incarceration rate worldwide" he asks, "does incarceration efficiently deter crime? Indeed, for some offenders, the additional cost associated with their imprisonment exceeds the benefit to society of deterring their crimes." *Id.* at 639-40.

As for whether an incarcerative sentence is appropriate in Victor Btesh's case, general deterrence, we submit, should carry little weight in the § 3553 calculus.

Although seldom discussed, the extent of publicity a case has received and will continue to receive should naturally figure into the analysis whether a given sentence will further the goal of general deterrence.

> If a case has for some reason attracted great publicity, a severe sentence could be expected to have great deterrent effect. If, on the other hand, the publicity is minimal and the sentence probably will be known only to the defendant himself and the officials involved with the case, the judge could let the offender off with a light sentence without sacrificing any general preventive effects.

Forbes, Brian Jacobs, "The Role of Publicity in Sentencing" (Oct. 23, 2017) (quoting J. Andenaes, "The Morality of Deterrence," 37 U. Chicago L. Rev. 649, 656 (1970)), *available at* [https://www.forbes.com/sites/insider/2017/10/23/the-role-of-publicity-in-sentencing/?sh=58474b613e5c#5b9f5](https://www.forbes.com/sites/insider/2017/10/23/the-role-of-publicity-in-sentencing/?sh=58474b613e5c#5b9f5).

Research discloses little pretrial publicity attendant to Mr. Btesh's Indictment in East Tennessee. He has never lived in Knoxville or East Tennessee. His sole connection to East Tennessee stems from a man, David Camp, who lives in Sweetwater, Tennessee. Mr. Btesh has never met David Camp. Mr. Btesh's businesses have no public or obvious presence in Knoxville unlike, for example, Pilot-Flying J.

Nothing logically suggests itself how general deterrence would be served in this case by an incarcerative sentence for a somewhat generic-sounding offense, conspiracy to commit antitrust violations, imposed on a defendant with no ties or connections to this community. Nor is it likely that this case will capture much national attention beyond what has been posted on the DOJ Antitrust Division website.

62

PENDING REQUEST TO BE FILED UNDER SEAL

PENDING REQUEST TO BE FILED UNDER SEAL

PENDING REQUEST TO BE FILED UNDER SEAL

PENDING REQUEST TO BE FILED UNDER SEAL

## X.  THE "FIRST-OFFENDER" CRIMINAL HISTORY PHILOSOPHY

Another significant factor that Mr. Btesh asks this Court to take into consideration in crafting an appropriate sentence is that he is a true first offender – no prior arrests, dismissals, expungements or the like.  For many years, the Sentencing Commission has been urged to take a hard look at creating a Criminal History Category below what is currently designated at Category I, for those offenders who have never previously been arrested or who have no convictions.

For the first time in five years, the U.S. Sentencing Commission has sent a series of proposed Guidelines amendments to Congress, which if Congress does not act to veto will become effective on November 1, 2023.

Among the amendments is a 2-level downward adjustment for certain Zero-Point Offenders, those with no criminal history points.  To qualify, however, an offender must meet additional criteria.  Of the ten criteria, Mr. Btesh satisfies all except the last requirement that he not receive an adjustment under § 3B1.1.  But for that restriction and were he sentenced after November 1, 2023, he would be entitled to a 2-level decrease in the offense level.

Nothing prevents a sentencing court from considering pending amendments to the guidelines and exercising discretion to grant a variance that accomplishes what the pending amendment to the guideline will do.  *United States v. McMillan*, 863 F.3d 1053, 1058 (8th Cir. 2017).

Nothing, moreover, restricts this Court from granting a variance to Mr. Btesh in consideration that he meets nine of the 10 criteria for consideration by granting a 1-level

decrease in the offense level. Indeed one thing that prompted the Commission to provide for a new downward adjustment was that offenders with zero criminal history points received higher rates of downward variances from courts nationwide than those with even a single history point and had the lowest rates of recidivism.

## XI. RECOMMENDATIONS OF THE ALEPH INSTITUTE

In terms of exploring sentencing possibilities in this case, undersigned counsel enlisted the assistance of the Aleph Institute, which has garnered significant respect throughout the federal system for its work, inter alia, on the benefits of alternatives to incarceration. Attached hereto is its sentencing proposal humbly submitted to further the goals of sentencing in achieving optimal results for Victor Btesh and for society. (Attachment 34).

## XII. FINES

The Revised Presentence Report notes that it appears that Mr. Btesh may have the ability to pay a Guidelines range fine. His personal fine range is $20,000 to $95,000 based on a volume of commerce of $1.9 million. The fines for the individual indicted business entities have been set by reference to the sentencing guidelines and are subject to offset in recognition that closely-held businesses should be treated differently.

The defense is proposing a personal monetary fine of two percent of the agreed $1.9 million volume of commerce, which is $38,000. Such fine is sufficient but not greater than necessary to accomplish the goals of sentencing.

## XIII.  CONCLUSION

Through this sentencing memorandum, Mr. Btesh has attempted to put specific form to the § 3553(a) factors.  There are some who view probation as second-class punishment.  Yet, Mr. Btesh is among the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend and who should receive probation.

A structured and monitored probationary sentence represents meaningful punishment in this case and serves as a substantial restriction of Mr. Btesh's freedom.  As recognized in *United States v. Knights*, 534 U.S. 112, 119, 122 S. Ct. 587 (2001), "Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'"

Respectfully submitted this 10th day of July, 2023.

THE BOSCH LAW FIRM, P.C.


By:   s/Donald A. Bosch
      DONALD A. BOSCH (BPR # 013168)
      ANN C. SHORT (BPR # 009645)
      712 South Gay Street
      Knoxville, TN  37902
      (865) 637-2142

      *Counsel for Victor Btesh*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies on this date a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

This the 10th day of July, 2023.

THE BOSCH LAW FIRM, P.C.

By:  s/Donald A. Bosch
     Donald A. Bosch